# SUFFOLK COUNTY.

## JOSEPH LYMAN *vs.* CHARLES ROBINSON.

Two parties at a distance from each other corresponded as to the sale by one to the other of certain lots of land, and numerous letters passed between them in relation thereto, and a price and times of payment for the entire purchase were agreed upon, with the understanding that the lots should be valued separately, in proportion to the valuation of the whole, and the title remain in the vendor, and a deed of any lot be given whenever the amount of the valuation thereof should be paid ; and the purchaser accordingly inclosed his notes for the entire price, with his appraisement of the several lots, and with a statement that the vendor would of course forward a suitable paper, as evidence of the sale. The vendor replied that if this appraisement should be increased, as to a portion of the lots, and one lot excluded from the purchase, the papers could be settled at once. It appeared to the court from the correspondence that the purchaser understood that the last mentioned lot was included in the bargain, and that the vendor did not so understand it, and that in respect thereto the minds of the parties never met. *Held*, that no action could be maintained by the vendor upon the notes.

CONTRACT brought by the plaintiff, as treasurer of the Kansas Land Trust, to recover the amount of three promissory notes for $5000 each, signed by the defendant and payable to the plaintiff, as such treasurer, or order, dated August 11th 1857, and payable June 1st 1858, December 1st 1858, and June 1st 1859 respectively.

The following facts were agreed in this court: For some time prior to the correspondence hereinafter mentioned, the plaintiff was treasurer of the Kansas Land Trust; the defendant was the agent, and resident in Kansas; and Amos A. Lawrence, William D. Pickman and Robert B. Storer, all of Massachusetts, were the trustees.  A correspondence took place between the plaintiff and defendant, respecting the sale to the defendant of the lands of said trust remaining unsold, and such portions thereof as are material are shown by the following abstract and extracts :

On the 11th of June 1857, the plaintiff wrote to the defendant saying that the trustees of the Kansas Land Trust, who held the title to the lands, had requested a list of the property, and he had given them one which he recites in the letter ; that the trustees would be willing to sell all this property to the defendant; he then asked the defendant on what terms he would take the above list at cash ; or if he preferred time, at what short time and on what terms as to security.

June 28th the defendant replied that he should like to purchase this property, but could not pay cash, and he wished to know what kind of security would be required, and said that if he could give it he should be glad to make the purchase and would make an offer.

July 13th the plaintiff wrote in reply that the trustees would take the defendant's notes or other satisfactory notes on six, twelve and eighteen months, secured on the premises offered, and other good real estate, and added, " I hope you will be able to make an offer for this property that the trustees will accept."

July 29th the defendant wrote that he would give twenty per cent. advance on all the general fund property in payments of six, twelve and eighteen months, with ten per cent. interest ; this to include all the purchases of general fund.

August 11th the plaintiff replied to this offer, that the trustees could not then go into such an investigation and settlement of accounts as would be required to settle the amount of the defendant's proposal, and prefer to nave from him or some good party " a simple offer to purchase all of their property and

interest in Quindaro remaining unsold." The letter continued as follows: "From conversation with the trustees, I think they would accept an offer from you of $15,000, in your notes with interest, payable, one third, say $5000, 1st June 1858; and like amounts payable 1st December 1858, 1st June 1859. The above in full for your services and commissions for the trust, and for the remaining property belonging to the trust unsold. . . . . These notes might be secured by mortgage on the premises offered, or on other real estate. But perhaps it would be best to have the lots and parcels of land valued proportionably to the valuation of the whole at $15,000, and the title retained in the hands of the trustees. Then, whenever you should make any sale and remit the amount of the valuation, the trustees give a deed to your purchaser. In this way we should avoid putting any incumbrance on the land, and to that extent the sales and titles would be more clear and convenient."

September 1st another letter from the plaintiff contained the following paragraph: "I have no advice as to the situation and quality, &c., of the land bought for the trustees of Otis Webb, except that the deed has been sent to me, and from the description in that deed (as copied by my clerk) I cannot spot the land on the map. When the deed returns from record through your office, please see if the description is correct; and at any rate let me know as to the quality and position of the purchase."

September 14th the defendant replied to the letter of August 11th: "I will give $15,000 for the trust general investment, in addition to the amount forwarded to you, and on the terms you propose. I think the last proposition you make would be less cumbersome and quite as safe for you as the mortgage, and would suit me quite as well." "If you will send out the notes, agreement, &c., I will execute them."

The plaintiff's answer of October 2d was as follows: "I have yours of 14th ultimo, accepting of the offers of mine of 11th August; those expressed in the terms following, for the purchase of all the property (of this trust in Kansas) and the interest in Quindaro remaining unsold for $15,000, in your notes with interest, payable, one third, say $5000, 1st June 1858; and like

**amount** payable 1st December 1858, and 1st June 1859. The above, in full for your services and commissions for the trust, and for the remaining property belonging to the trust unsold. The lots and parcels of land (thus sold) to be valued proportionably to the valuation of the whole at fifteen thousand dollars, and the title to be retained (as at present) in the hands of the trustees. Then, whenever you should desire to make any sale and remit the amounts of the valuation to the trustees (which amounts should be indorsed on the notes payable as received) the trustees will give a deed either to yourself or to your purchaser. It will not be very difficult to carry out the effect of this understanding between us. The notes for $15,000, with interest, should bear date on the 11th August, (the date of the offer accepted,) each for $5000, with interest, and due at the dates as above set forth. Upon the above notes coming to hand, the trustees will give you a receipt for the notes in a form not to effect any incumbrance upon the lands, but acknowledging fully their responsibility to yourself. Accompanying the notes, you should forward to us a complete list or schedule of the lands and interests in question, affixing to each parcel of land, or Quindaro share or interest, such a proportional valuation as shall make the whole come to $15,000. *As the above does not include any land of the purchase of which we were not advised 11th August,* it will be proper for you to render and settle your account to the latest date, and the trustees will turn over to you any such purchase at cost, adding the cost to the $15,000. Your accounts, as far as formally rendered to me (without vouchers) stands to your debit on the books of the trust $4041. From this amount should be deducted such amounts as you may have since paid for our account for special investments, &c., of which you should hand in an account to the latest date, and pay the balance of the same. Thus will the affairs of the general fund of the trust be brought to a close in a manner most advantageous to your interests. If you have associates in this purchase their names, as well as your own, should be signed to the notes as above."

The defendant replied October 16th, as follows: " Yours of

2d instant is received. Herewith is account with trust since **the** last statement. . . . . I have appraised the property as follows :

| | | |
|---|---|---|
| 98 acres of J. Williams' land . . . . . | $1000 | |
| 69$\frac{20}{100}$ " Porcupine " . . . . . | 900 | |
| 40 " Webb . . . . . . . . . | 2000 | |
| 66$\frac{2}{3}$ " Ferry lot . . . . . . | 3400 | |
| 30 " Bargained to Hall and others | 600 | |
| 19 shares in Quindaro C. 250 . . . . | 4750 | |
| 30 " in Delaware C. 100 . . . . | 3000 | |
| 50 acres in " . . . . . . . . | 1000 | |
| | | $16,650 |

" Inclosed are three notes of $5000 each, payable June and December 1, 1858, and June 1, 1859. I have not yet arranged for a partner ; but if I do, and you desire it, I will get him or them to sign the notes at some future time. . . . . Should you find anything wrong in the settlement or appraisement, I will correct it. . . . . You will of course forward a suitable paper, as evidence of the sale."

The receipt of this letter was simply acknowledged by the plaintiff October 28th. And he wrote more fully, November 17th 1857, as follows : " Since my last, acknowledging the re ceipt of the accounts, &c., from you, I have been so much occu- pied that I have not been able to examine those papers with a view of preparing the agreement between the trustees and your- self for the sale and purchase of that property. I now find that you have included in the schedule of it the land purchased of Otis Webb for $2000. If you will refer to my No. 64 of the 2d of October, of which yours of the 16th of October is a reply, you will find on 2d page as follows : ' As the above does not include any land of the purchase of which we were not advised 11th August, it will be proper for you to render and settle your ac- count to the latest date, and the trustees will turn over to you any such purchase at cost, adding the cost to the fifteen thou- sand dollars.' From the above, it would seem to me that the land covered by the deed from Capt. Webb may be at your option declined ; or, if you receive it from the trustees at cost

that the amount of its cost should be added to the notes for fifteen thousand dollars. The trustees had never received any advice of this purchase, as far as I am aware, either in letters or accounts; and, until Mr. S. C. Smith showed me its location on the map, I had supposed it to refer to some previous purchases for the trustees, which were included in your accounts rendered to 30th April last. I would suggest that you should not include this Webb lot in your purchase, as I think it would be well for the trustees still to retain an interest there of some small amount. Then, if you will amend the valuations by fixing each Quindaro share at $300, instead of $250, and striking out the Webb pur chase, the papers can be at once settled."

February 8th 1858, in reply to the last letter, the defendant said: " I supposed the Webb land was to be included in the arrangement; but should you prefer to except that, I propose that $2000 be deducted from the price $15,000. I think that would be fair, under the circumstances."

April 21st 1858, the plaintiff wrote: " In relation to the purchase by you of the lands of our trust, I think you will see that I can myself do nothing. They were put to you at the lowest possible price that the interests of the depositors would bear; and you will observe in my letters that lands of which I had no advice of the purchase for our account at the time of the purchase were expressly excepted, and stated not to be included in the offer."

May 11, 1858, the plaintiff wrote: " What am I to do about your note, due June 1st, for $5000; and what is the condition of your proposed purchase of the trust lands ? "

May 24th the defendant replied: " I conversed with Mr. Lawrence while in Boston in regard to the trust lands, which of course he will relate to you. When I purchased it I supposed that I was purchasing all of it, and intended making such arrangements by sale and otherwise as to enable me to meet the notes when they became due. The money crisis drained our territory of money and discouraged all trade. It would be impossible just now to make any arrangements by which the note could be paid. There are parties here disposed to make

investments. with whom I think I shall be able to conclude a bargain for a large portion of it."

July 19th the plaintiff wrote : " Any information you may be able to transmit to me respecting the values of our lots in Quindaro or the lands in its neighborhood will thankfully be received."

October 21st 1858, the plaintiff wrote : " I hand you the inclosed respecting the titles being given for Quindaro lots. . . . . Your note of $5000 comes due 1st December next. . . . . Any information respecting Quindaro or the trust lands generally, and the prospects of our investments, I shall gladly receive."

April 25th 1860, the plaintiff wrote : " All the deeds for lands purchased should be made to the trustees, as has heretofore been done, as far as deeds have been received for the purchases made with their funds. And I am desired to impress it upon you that the deeds should be completed and forwarded as soon as possible."

August 21st 1860, the defendant, in sending certain deeds, wrote : " I believe now the trustees have a perfect title to all their land; and if they desire to settle up the trust, they can divide up the land among the contributors to the fund. This in my opinion is the only way it can be settled now, without very great sacrifice, as it is utterly impossible to realize money for land at the present time ; and the land is better than any securities that can be obtained for it. Should you desire to make a division of the land, I will forward a fair appraisal of each lot separately ; and the division can be then made by the trustees without further trouble."

September 22d the plaintiff acknowledged the receipt of the foregoing letter, and promised to write further when instructed by the trustees.

November 30th the plaintiff wrote as follows, concluding the correspondence : " I regretted not to have seen you when you were in these parts during the late elections ; and the expectation of meeting you personally has delayed my writing you, as I do at present, to advise you of the action of the trustees of the Kansas Land Trust, upon the proposition made by you in yours

**of 21**st August last, to divide the lands bought for the trust among the depositors of the general fund. Upon the receipt by me of that favor on the 22d September last, I acknowledged the receipt of the same, and promised to lay the proposition in question before the trustees. I was not however able to obtain a full meeting of them until the 7th inst., and then, all being present, the whole of your communication was read. They concurred in instructing me to reply to you respecting the same, that they do not consider themselves authorized to disturb the arrangements of sale and purchase by you of the lands settled in August and September 1857, and for which they hold your notes."

It was agreed that, unless the sending of the notes to the plaintiff, and the letters, constituted a valid contract, the notes were and are without consideration.

No deed of any of the premises referred to in the letters was ever made to or for the defendant, and no other receipt or instrument than said letters was given or received by either of the parties. All the lands of the trust remaining unsold, including the lands of the trust in Quindaro and vicinity, and the Webb lot, were described in the schedule in the defendant's letter of October 16th 1857, and they did not purchase or sell any lands in Quindaro thereafter.

The case was reserved by *Gray,* J., with the agreement that the plaintiff should recover or become nonsuit, as the full court should determine.

*S. Bartlett & F. C. Loring,* for the plaintiff. The view of the defendant is that, since the parties differ as to what lands are embraced in the accepted proposal, their minds never met, and so no contract exists. We answer that this is a suit at law, and even if by the doctrines of a court of equity the defendant's view could be sustained, yet those doctrines have no application in this cause. But even in a court of equity they would have no application to the facts as here stated. The offer and acceptance are in writing. No extrinsic evidence of acts or declarations of the parties, or of any other fact anterior to or contemporaneous with the contract, is offered, which might lead a court

of equity to say that there was no concurrence of the parties. To use the language of this court, in a suit in equity where the contract was made by correspondence, " All that appears by the bill and answer is, that the parties, after the agreement was made, put a different construction on it; 'an occurrence by no means uncommon. It is true that the parties declare that they understood the agreement differently at the time it was made, but it does not appear that the construction which either party put on the agreement was made known to the other until after the agreement was concluded. Both parties are therefore bound by the terms of the agreement, and it is to be construed by the court." *Miller* v. *Lord,* 11 Pick. 11–24. In *Kennedy* v. *Lee,* 3 Meriv. 441, Lord Eldon applies this doctrine with great clearness to a case where specific performance of a contract by correspondence was decreed, and where he admits that the defendant was under a mistake.

The distinction between cases where a court of equity refuses to enforce specific performance, but leaves the parties to their legal remedies, and a case of the present character, need hardly be adverted to; and the point that, in such cases, where a court of equity consents to be active, extrinsic proof is the basis of its proceeding, is shown in *Miller* v. *Lord.*

Let it not be said that the contract was not completed because the plaintiff did not forward " a suitable paper as evidence of the sale," mentioned in the postscript of the defendant's letter of October 16th. The contract had already been completed by the letters of September 14th and October 2d. In the latter, the plaintiff had promised, on receiving the notes and a list of the lands with valuations, (such as the defendant desired to enable him to sell the same while held by the plaintiff as security,) to forward a receipt " acknowledging fully their responsibility to the defendant." But accompanying this letter of October 16th, the defendant set up a claim to include the Webb lot in this receipt, which the plaintiff could not agree to; and so this promise, which was collateral and for convenience, forming no part of the contract, could not be performed,

*J. P. Converse & E. A. Kelly,* for the defendant, cited to the

**point** that, in order to constitute a contract by written corre- spondence, the offer of one party must be accepted by the other as it was made, without reservation, alteration or qualification, *Holland* v. *Eyre*, 2 Sim. & Stu. 194; *Routledge* v. *Grant*, 4 Bing. 653; *Wontner* v. *Shairp*, 4 C. B. 404; *Duke* v. *Andrews*, 2 Exch. 290; *Carr* v. *Duval*, 14 Pet. 77; *Hutcheson* v. *Blakeman*, 3 Met. (Ky.) 80; that both must be bound, or neither, *Tucker* v. *Woods*, 12 Johns. 190; *Livingston* v. *Rogers*, 1 Caines R. 583; and that where the negotiation contemplates a further thing to be done to complete the contract, no binding contract exists till that is done, *Governor, &c., of Kingston upon Hull* v. *Petch*, 10 Exch. 610; *Ridgway* v. *Wharton*, 6 H. L. Cas. 238.

FOSTER, J. The only consideration of the notes upon which this action has been brought is an alleged agreement by the plaintiff as agent to sell and convey, and by the defendant to purchase, certain lands in Kansas. It is found as a fact that the trustees, whose agent the plaintiff was, ratified all his acts in the premises. The case may therefore be considered as though the plaintiff had been himself the owner of the lands which were the subject of the negotiation between the parties. The correspondence between the plaintiff and defendant is the only evidence from which we are called upon to determine whether they entered into any agreement amounting to a valid consideration for the notes. We have examined the numerous letters with great care, and deduce from them the following con- clusions:

It seems clear that in the early part of the correspondence neither party had reference to the Webb lot as embraced within their negotiations. Both had in view the list of property given in Lyman's letter of June 11th. The precise date of the pur- chase of the Webb lot does not appear. But the account rendered by Robinson shows that it must have been bought some time in June; and Lyman's letter of September 1st shows that he had then received a deed of it. Robinson's first offer of July 29th was to take the whole of the trust lands at twenty per cent. above their cost. We perceive no reason to suppose that this proposal was not by him intended to include the Webb lot,

and it certainly did include it in terms. Lyman's reply of August 11th solicited a simple offer for all the property, and suggested that the price of $15,000 would probably be accepted by the trustees. This letter was not an offer to sell at that price, but a strong intimation that if Robinson chose to make the offer it would be accepted. So far as we can judge, by a comparison of dates, when this letter was received Robinson may well have understood that notice of the Webb purchase had already reached Lyman. When it was answered, September 1st, the deed of that lot had been in his possession. Robin-son's letter of September 14th made distinctly the offer of $15,000 "for the trust general investment." This language necessarily included the Webb lot, and thus far in the correspondence we find nothing to indicate that either party expected that any of the lands which had been purchased for the trustees were to be excluded from the proposed sale; the inducement to make which on the part of the trustees had been declared by Mr. Lyman to be to close the trust. But Mr. Lyman's next letter of October 2d limits his acceptance to the purchases of which the trustees were informed on August 11th, the date when he had written suggesting the price of $15,000. This was natural and fair enough on the part of Mr. Lyman and the trustees. But Robinson made no offer with such a qualification, and none was accepted without it.

The only interpretation we can put on the correspondence is, that the minds of the parties did not meet and agree upon the subject matter of the contract. They agreed on the price to be paid, but differed as to what was to be purchased for that price. And this difference was never reconciled. Neither party at any time yielded to the claim and construction contended for by the other. The case presented is therefore one of an imperfect negotiation, and not a completed contract.

Nor can we regard Robinson's letter of October 16th, inclosing the notes now in suit, as a waiver by him of his claim to have the Webb lot included in the bargain. For this lot is a part of the list of the property for which the notes were given, contained in that letter; and it is added in a postscript, " You

will of course forward a suitable paper, as evidence of the sale."
The notes must be regarded as having been sent on the condi-
tion that the Webb lot should be embraced in the contract which
was to be given in return.   They were also sent in conformity
with a request in Lyman's last preceding letter, and upon
the assurance, on which Robinson was entitled to rely, that.
" upon the above notes coming to hand the trustees will give
you a receipt for the notes in a form not to effect any incum-
brance on the land, but fully acknowledging their responsibility
to yourself."

Furthermore, if the parties had agreed what lands were to be
included in the contract to be drawn up, and for which the notes
were given, another insuperable difficulty would remain.   They
had negotiated as to the mode by which the trustees should re-
ceive payment.   The title to all the lots was to remain in them,
each was to be valued separately, and upon payment of the
agreed valuation of any lot Robinson or his appointee was to be
entitled to receive a deed thereof.   The object of this arrange-
ment was twofold; to keep the trustees constantly secured so
that they might not convey away any part of the property until
they were paid for it *pro ratâ;* and on the other hand, Robinson
was to be entitled on each such proportional payment to have a
conveyance of so much land as he paid for.   This provision was
especially important to him, as both parties well understood that
he bought the land to sell again, with a view to the profits of
such sales.   The valuation to be placed on the several lots was
therefore a material and essential term of the bargain to both
parties; to the trustees, as affecting their security; to the pur-
chaser, as enabling him to make from time to time partial sales,
and thus obtain the means of meeting his own payments.   In
the letter inclosing the notes was contained the valuation pro-
posed by Robinson; but the reply of Lyman, November 17th,
rejected this valuation, and required Robinson to accede to a
different one.   Lyman says: " If you will amend the valua-
tions by fixing each Quindaro share at $300 instead of $250,
and striking out the Webb purchase, the papers can be at once
settled."   This never was done, and the failure of the parties to

come to a definite agreement on this point of itself precludes **the** idea of any completed contract.

This language of Lyman, and Robinson's previous statement to him, " you will of course forward a suitable paper as evidence of the sale," have in another aspect an important bearing upon the case. A valid contract may doubtless be made by correspondence, but care should always be taken not to construe as an agreement letters which the parties intended only as a preliminary negotiation. The question in such cases always is, did they mean to contract by their correspondence, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up and by which alone they designed to be bound ? " The circumstance that the parties do intend a subsequent agreement to be made is strong evidence to show that they did not intend the previous negotiations to amount to an agreement." Lord Cranworth, in *Ridgway* v. *Wharton*, 6 H. L. Cas. 268. In the same case, Lord Wensleydale says, p. 304 : " An agreement to be finally settled must comprise all the terms which the parties intend to introduce into the agreement. An agreement to enter into an agreement upon terms to be afterwards settled between the parties is a contradiction in terms. It is absurd to say that a man enters into an agreement till the terms of that agreement are settled. Until those terms are settled, he is perfectly at liberty to retire from the bargain."

These remarks are strikingly applicable to the present case. The parties were discussing the terms of a paper to be drawn up and signed by the trustees themselves. They could not agree what property should be embraced in this contemplated contract, nor how much the purchaser was to pay to become entitled to a separate deed of the different parcels. Their negotiations remained incomplete, and neither party became bound. Consequently the notes were without consideration, and by the agreement in the report the plaintiff must become nonsuit.

*Plaintiff nonsuit.*