## Wytheville.

### HUGHES v. BURWELL.

June 13, 1912.

1. INSTRUCTIONS—*Evidence to Support—Contracts.*—Where parties have entered into a valid and binding oral contract, it is not error to refuse to instruct the jury that the contract is not binding because not reduced to writing, in the absence of any evidence tending to show such an agreement between the parties.

2. SALES—*Chose in Action—Failure to Assign—Contracts—Completeness.*— Where a valid and binding contract for the sale of a chose in action has been entered into between parties, the obligation of the parties thereunder is not affected by the failure of the seller to execute a formal assignment thereof to the buyer; and the buyer cannot escape liability for the agreed price on account of the failure of the seller to make a formal assignment, which he has, at all times, been ready and willing to make. The contract is not incomplete.

Error to a judgment of the Corporation Court of the city of Danville, in an action of *assumpsit.* Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Julian Meade,* for the plaintiff in error.

*William Leigh* and *Harris & Harris,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The defendant in error, M. P. Burwell, brought this action of *assumpsit* and recovered a judgment in the Corporation Court of the city of Danville against the plaintiff in error, John E. Hughes, for the sum of $2,570.57, which the plaintiff alleged that the defendant agreed to pay him for an open account which the

plaintiff held and owned against Swain & Wyllie, a partnership which had but recently made an assignment for the benefit of their creditors.

We are asked to review and reverse this judgment because of error of the court in failing properly to instruct the jury, and in refusing to set aside the verdict as contrary to the law and the evidence.

It appears that Swain & Wyllie were dealers in leaf tobacco at Danville, Va., while the plaintiff, Burwell, was engaged in a like business at Warrenton, N. C., and in April, 1910, Burwell sold to Swain & Wyllie a certain lot of tobacco, estimated at 41,000 pounds, at a certain price, which tobacco was shipped to the purchasers on or about June 16, 1910, and was duly received by them. There was no question as to the tobacco being received by Swain & Wyllie, but on July 29, 1910, they addressed a letter to Burwell, in which they expressed regret at being unable to pay for the tobacco, and gave excuses for not doing so, and added: "We are willing to pay you interest on your invoice for the delay," and further added: "In re-weighing the tare we notice that your hogsheads weigh from 10 to 13 pounds heavier than you have them, which we will deduct." On August 25, 1910, Swain & Wyllie paid Burwell, by check, on account, the sum of $2,000, leaving a balance due of $5,035.12, exclusive of interest. Some time in September, 1910, the firm of Swain & Wyllie failed in business, and made an assignment, the date of which does not appear in the record, and the debt then due to Burwell from that firm was $5,035.12 with interest.

On the 26th day of September, 1910, after the assignment had been made by Swain & Wyllie, Burwell came from his home in Warrenton, N. C., to Danville, to see after the debt due him by this firm, arriving in Danville at an early hour the following morning. After being in Danville several hours, he came upon the defendant, Hughes, and a conversation between them, in regard to his debt against Swain & Wyllie, took place at the Hotel Burton. At this conversation Burwell discussed with Hughes the subject of the failure of Swain & Wyllie, and in the conversation Hughes told Burwell that he had an account against that firm. Then followed a discussion between Burwell and Hughes about the assets

of Swain & Wyllie, and whether the assets were sufficient to pay their indebtedness, Hughes expressing the opinion that they would eventually pay out in full, or nearly so. Burwell, having little idea of what the insolvent firm would pay, said that he would be satisfied to accept sixty cents on the dollar of his account; whereupon Hughes asked Burwell if he would take fifty cents on the dollar for his claim, and, upon being asked by Burwell if he wanted to pay him that price, Hughes said, "Yes, I will give you that." Whereupon, Burwell asked Hughes to give him until 5 o'clock to consider the matter and to decide whether or not he would accept the offer, to which Hughes agreed. Between that time and 5 o'clock Burwell went to see a number of people. Among the number was Mr. Leigh, at his law office, and he discussed particularly with Mr. Leigh the offer which Hughes had made him for his claim against Swain & Wyllie; but, as Mr. Leigh was not sufficiently posted to advise him, he went to see others, with like results. He went again to see Mr. Leigh, when Mr. Leigh advised him to accept Hughes's offer, and thereupon Burwell went to see Hughes, reaching his office just before 5 o'clock, Hughes having said that he would be at his office at that hour, and invited Burwell to see him there. Upon reaching Hughes's office, Burwell told Hughes that he had decided to accept his offer of fifty cents on the dollar of his account against Swain & Wyllie, to which Hughes replied, "All right." Burwell then showed Hughes his account against Swain & Wyllie. He also showed him a contract, evidenced by a letter, showing that the tobacco he had sold Swain & Wyllie was sold to be paid for in cash, and shipment was to be made f. o. b. Warrenton, N. C., and then showed Hughes another letter from Swain & Wyllie, saying that they could not pay cash, but that they would allow him interest until they could pay it. Hughes then stated that that was all right, and expressed himself as finding it satisfactory; whereupon Burwell proposed to transfer the account to Hughes, and Hughes said: "Burwell, the trade is made. I have just started for a horseback ride; if you are not in a hurry, we will make the transfer of the account in the morning. I want to go out horseback riding." Burwell then told Hughes that he wanted to leave town on the early morning train, and asked, if convenient, that the transfer

be made that evening, to which Hughes replied that if Burwell would go up to Jones's drug-store, on Main street, he (Hughes) would meet him there. Burwell was walking, while Hughes had his horse at his office. Upon Burwell arriving at the drug-store, he had to wait some little while for Hughes, but Hughes came and said that his lawyer had told him that he did not think much of the trade, to which Burwell replied, "Mr. Hughes, the trade is already made; just a question of transferring the account"; to which Hughes replied: "All right, I am going to stand up to the trade, and we will go up and have the account transferred." They then went up into an office, and Hughes introduced Burwell to Mr. Meade, who he said was an attorney, and requested Mr. Meade to make the transfer of the account; and Hughes then turned to Burwell and said: "Burwell, if you will excuse me, I will finish my horseback ride. I will meet you at supper with the bill and transfer, and I will settle up with you." Burwell told him that it would not take but a few minutes. Hughes said he could not stay longer at that time, as it would knock him out of his ride, as it was getting late; whereupon Burwell said, "All right, we will meet at supper, and fix it up." Mr. Meade started to write the transfer on Burwell's account against Swain & Wyllie, but there was some little interruption, and it turned out, when the transfer was written, that it did not have the interest calculated on the account, as had been previously agreed upon, and Burwell called Mr. Meade's attention to that, to which Mr. Meade replied that he did not understand from Mr. Hughes that interest was to be added. Upon Burwell's insisting that that was the understanding between him and Hughes, the attorney made the calculation and entered it on the account, and read the account over to Burwell; whereupon Burwell told Mr. Meade that it was satisfactory to him, except that he did not think Mr. Hughes wanted it to show what it cost him, and the assignment did go on to show that it was fifty cents on the dollar. Some further conversation took place between the attorney and Burwell, which need not be related, and the matter of completing the transfer was delayed until the following morning.

Burwell and Hughes met according to appointment at the hotel about supper time, when Burwell told Hughes that Mr.

Meade did not understand that interest was to be added to the account, and that he was to receive fifty cents on the dollar of interest, to which Hughes replied, "Certainly, I intended to include that"; and, upon being told by Burwell that the transfer showed the amount he was to pay for the account, Hughes said he did not intend it to show that amount. There was no disagreement as to the terms of the agreement between Burwell and Hughes at that time, and they then agreed to meet at Mr. Meade's office at 8 o'clock the following morning to carry out the contract they had made by having a proper assignment of the account to Hughes.

The following morning Burwell met Hughes at the Hotel Burton, when Hughes asked him to let him off with the trade they had made the night before, stating that he had found out that the assignment of Swain & Wyllie was "rotten"; but Burwell declined to do so, and insisted on Hughes complying with his contract; whereupon Hughes went off and consulted an attorney, and came back and stated that he was not bound to stand up to the trade, and that he was going to be released, and then and there refused to carry out the contract.

It seems very clear from the evidence that all matters of detail were discussed between Burwell and Hughes, and that they finally agreed upon the sale by Burwell and the purchase by Hughes of Burwell's claim against Swain & Wyllie. Burwell stipulated that interest was to be added; Hughes agreed to it. The account was to be transferred without recourse; Hughes agreed to it. Subsequently Hughes stipulated that Burwell should guarantee the correctness of the account, and to this Burwell agreed, and declared himself ready to do so. The question of interest and the question as to the correctness of the account had all been settled and agreed to before Hughes attempted to repudiate his agreement on the morning of September 28, 1910.

There is practically no controversy as to what took place between Burwell and Hughes with respect to the contract they entered into, which was, in all respects, complete, leaving nothing to be done except to have it properly transferred from Burwell to Hughes—that is, as Hughes stated, "transferred satisfactorily and legally."

After the evidence had gone to the jury, the court gave, at the request of the plaintiff, and without objection on the part of the defendant, the following instruction:

"The court instructs the jury that if they believe from the evidence in this cause that the late firm of Swain & Wyllie, of Danville, Virginia, was, on the 25th day of September, 1910, indebted to the plaintiff, M. P. Burwell, in the sum of $5,141.15; that upon the failure of the said Swain & Wyllie the said M. P. Burwell came to the city of Danville, to look after his interest as one of the creditors of the said firm; that while so in Danville the plaintiff met with the said defendant, and that the matter of the failure of the said Swain & Wyllie was discussed between them, and that the defendant, Hughes, offered the said plaintiff, M. P. Burwell, fifty cents on the dollar for his said claim against the said firm of Swain & Wyllie, and that the offer of said Hughes so made was accepted by the said Burwell, and that the said Burwell was willing and offered to make proper assignment and transfer of said claim to said Hughes, that this made and constituted a binding contract and sale between them, and the plaintiff is entitled to recover of and from the said Hughes the sum of fifty *per centum* of his said debt and claim of $5,141.15 against said Swain & Wyllie—to-wit, the sum of $2,570.57½, with interest thereon from the 27th day of September, 1910, and the jury should so find."

Whereupon, the defendant, by counsel, moved the court to give the jury three instructions, and the court gave the second of these, but refused to give the first and third.

Instruction No. 2, given, is as follows: "The court instructs the jury that in order for the offer of plaintiff to sell his claim against Swain & Wyllie, and the alleged acceptance of that offer by defendant, to constitute a binding contract, they must believe from the evidence that the said offer was completely accepted in every particular, and that nothing remained for future determination or settlement between the parties to the alleged agreement; and if they do not believe from the evidence that the offer of plaintiff to sell his said claim was accepted by defendant completely and in every particular, with nothing left for future settlement or arrangement between the parties, then they must find for the defendant."

Defendant's instruction No. 1, refused, sought to have the jury told that if they believed from the evidence that there was an agreement between the parties to this suit whereby the defendant was to buy plaintiff's claim against Swain & Wyllie, with the further understanding that the terms of the agreement were to be expressed in writing, and said parties failed to reduce the terms of their said agreement to writing, then the agreement was not perfected, and they must find for the defendant.

This instruction is plainly defective, in that it stated the proposition that, although there might have been a complete contract between Hughes and Burwell, yet if there was an understanding that the terms of the agreement were to be expressed in writing, and said parties failed to reduce the terms of their agreement to writing, then an agreement was not perfected, and the jury must find for the defendant. There was no evidence tending to show that the agreement between the parties was not to be final until reduced to writing; nor was there any evidence tending to show an agreement that the contract was not to be binding until reduced to writing. On the contrary, the evidence very plainly shows that nothing was to be drawn up in Mr. Meade's office but a suitable assignment of the account from Burwell to Hughes, pursuant to the contract between them previously entered into.

Defendant's instruction No. 3 is substantially the same as defendant's instruction No. 1, in that it sought to tell the jury that if they believed from the evidence that there was an agreement between the parties to this action, whereby the defendant was to buy plaintiff's claim against Swain & Wyllie, with the further understanding that the terms of the agreement were to be expressed in writing, and when they sought to express the terms of said agreement in writing they could not agree upon the terms to be inserted in said writing, then the agreement of purchase and sale was not complete.

Again we say there was no evidence to justify the giving of this instruction. The assignment and delivery of the account was not the contract; it was only the act of delivery of the subject of the contract. It was not necessary, nor was it ever intended, that the assignment should embrace the contract, for the contract was distinct from the assignment,

and both parties understood that, in the usual course of business an account and a right to it was passed by an assignment on the account, but neither understood that the assignment was to set out all the terms of sale, binding Hughes to take and Burwell to sell the account, as all that had been agreed upon between the parties, and when they went to Mr. Meade's office the formal and usual assignment of the account was all that was to be done, except the payment of the money therefor by Hughes, or the giving of his note for it, which was a matter of accommodation to Hughes, and which Burwell had agreed to.

The contract entered into between the parties contained all the essentials of a contract on the part of Burwell to sell his account against Swain & Wyllie to Hughes, and on the part of Hughes to buy the said account, at a price agreed upon. Benjamin on Sales (4th Am. ed.), sec. 39.

The case of *Lyman* v. *Robinson,* 96 Mass. 242, cited by plaintiff in error, has no application to the facts of this case. That case was one in which there was a mistake as to what was offered and what was bought—that is, there was a mistake as to the subject matter of the contract, which is by no means the case here. Nor does what is said in Clark on Contracts, p. 37, apply to the facts of this case.

In *Sanders* v. *Pottlitzer, &c. Co.,* 144 N. Y. 209, 39 N. E. 75, 43 Am. St. Rep. 757, 29 L. R. A. 431, the principles applicable to a case like the one under consideration are discussed, and it was there held that a stipulation to reduce a valid written contract to some other form does not affect its validity, and the stipulation may not be used by either of the parties for the purpose of imposing upon the other additional burdens or obligations, or of evading the performance of any of the provisions of the contract. This rule applies where, by means of letters and telegrams exchanged between the parties, a clear and definite proposition, containing all the requirements of a completed contract, is made by one and accepted by the other, with an understanding that the agreement shall be expressed in a formal writing. Where, therefore, in such a case, one of the parties refuses to execute the formal agreement, unless certain material conditions and provisions are inserted therein, not contemplated or embraced in the

correspondence, to which modification the other party declines to assent, the former is still bound by the contract as made by the correspondence." In other words, it was held in that case that, a valid and binding contract having been entered into between the parties, the obligation of the parties thereunder was not affected by the failure to execute the formal instrument, and that for the damages resulting from defendant's breach of the contract he was liable. See also *Pratt* v. *Hudson River R. Co.*, 21 N. Y. 305.

We have adverted to enough of the evidence to show that we think that the jury were warranted in their finding of a verdict in favor of the plaintiff, and there was no error in the judgment of the trial court refusing to set aside that verdict. Therefore, the judgment of the trial court is affirmed.

*Affirmed.*