No. 18,651.

H. E. OSBURN, *Appellant,* v. MRS. L. M. ADDINGTON, et al., *Appellees.*

SYLLABUS BY THE COURT.

1. BROKER—*Exchange of Properties—No Completed Agreement —No Commission Earned.* A broker who undertakes for his principal to negotiate an exchange of properties on specified terms or those which will be satisfactory to his principal is not entitled to a commission until an agreement between owners has been made nor so long as any of the material terms or conditions of the exchange are unsettled.

Osburn v. Addington.

2. SAME. The evidence herein examined and it is held that the
acts and declarations of the owners of the land show that
they had proceeded no farther than preliminary negotiations,
that a completed agreement had not been made, and that no
commission had been earned by the broker.

Appeal from Greenwood district court; ALLISON T.
AYRES, judge. Opinion filed February 7, 1914. Af-
firmed.

*Earl Blake, W. A. Ayres, C. A. McCorkle,* all of
Wichita, *Lew E. Clogston,* and *Robert H. Clogston,* both
of Eureka, for the appellant.

*W. H. Vonder Heiden, Ashton E. Morgan,* both of
Newton, and *Howard J. Hodgson,* of Eureka, for the
appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: H. E. Osburn brought this action
to recover from Mrs. L. M. Addington and her hus-
band a commission alleged to have been earned in pro-
curing the sale or exchange of the Addington ranch in
Greenwood county for a tract of land in Woodson
county owned by G. W. Hamilton. The Addingtons,
who resided in Illinois, placed their Kansas land, which
is a tract of about five hundred and eighty-five acres,
in the hands of A. J. Houchin, of Bloomington, Ill.,
to be sold or exchanged for other property. Houchin
at once started inquiries and made efforts to negotiate
a sale or trade that would be acceptable to the owners,
and among others entered into correspondence with the
appellant, Osburn. Many letters passed between
Houchin and Osburn relating to a sale or exchange of
the land, and in this correspondence Osburn was in-
formed that Houchin had interested other agents in
the disposition of the land, and that the first satisfac-
tory offer received by him would be accepted. The
Addingtons dealt only with Houchin, and no letters
regarding the sale or exchange of lands passed between

them and Osburn. A trade for Oklahoma land was suggested by Osburn to Houchin, which upon inquiry was found to be unsatisfactory, and finally he proposed an exchange for the Hamilton land in Woodson county. On behalf of Osburn, it was alleged that he procured Hamilton, who was ready, willing and able to trade lands on the terms proposed by the Addingtons, thus earning his commission, and he insists that the fact that the Addingtons chose to sell the land to another did not relieve them from liability for the commission which he had earned. The Addingtons, on the other hand, allege that they had employed Houchin to find a purchaser for the lands; that they had not employed Osburn nor authorized any one else to employ him as their agent in the sale or exchange of the lands, and neither had they ever recognized him as their agent. They claimed that Houchin had submitted a proposition to them to exchange their land for the Hamilton land, and that they had entered into the negotiations looking towards an exchange, but that while investigations were being conducted and a trip to Kansas to ascertain the quality and value of the Hamilton land was under consideration a cash offer for the land was made by another party, which they accepted. It is their contention that only preliminary negotiations were had, and that there was no meeting of minds, and further, that there was to be no closing of a contract until after a personal examination of the property had been made and an agreement reached on some unsettled terms and conditions. The trial court, upon a demurrer to the evidence, held that the negotiations of the parties had not been completed, that a binding contract had not been made, and therefore no commission had been earned by Osburn.

Appellant complains and insists that the correspondence shows that definite terms of exchange of properties had been agreed upon and that he had produced one who was ready and able to make the exchange on

those terms.   The authority to represent appellees is
open to question.   His dealings were with Houchin,
who had authority to find a purchaser for the lands,
rather than with the appellees.   In their letters to
Houchin appellees spoke of appellant as Houchin's
agent, and some things in the letters tend to show that
this was his status.   However, appellees learned of his
efforts towards securing the exchange of properties
and of the commission he expected to obtain if he suc-
ceeded, and assuming that he had the necessary au-
thority to procure a buyer or one willing to exchange,
it must be held, we think, that the minds of the parties
never met as to the terms and conditions of exchange.
There were preliminary negotiations whereby some of
the terms of an agreement between the owners of the
property were arranged, but other terms and conditions
were not settled, and manifestly the appellees never in-
tended to close the deal until they had made a personal
visit to Kansas and inspected the Hamilton land.   In-
spection of the property offered in exchange for theirs
was spoken of in the correspondence as the condition
of an acceptance of this proposal as well as others that
were presented to them.   It was suggested at one time
that if a banker would certify that a loan of $3000
could be secured on the land offered to them that an
inspecting visit might not be necessary, but no such
certificate was produced.   Appellees valued their land
at $20,000, against which there were incumbrances
amounting to $14,000, leaving them an equity of $6000
in the land.   They desired to sell it for cash but were
willing to take some property in exchange if they could
get a satisfactory offer and one which would enable
them to raise about $585 with which to pay interest
which had accrued on the mortgages.   Appellant found
a man who was willing to meet this single condition;
but it was only one of the terms of the exchange that
was under negotiation.   In a letter to Houchin appel-
lant stated that he had a party who had a farm to ex-

change, which he described, that was worth about the amount of the equity which appellees had in their land, and suggested that appellees come and look at it in case there was a prospect for a trade. The letters of appellant discussing the proposal and the likelihood of bringing the parties to an agreement were sent to appellee Mrs. Addington by Houchin, and on August 7, 1911, she replied that she was glad that Hamilton was going to look at her property, and that if it was satisfactory to him "and things are as they have represented them to be—we will close the deal soon as we find it to be so." She added that she wanted to know how much could be borrowed on the place, that they could not close the deal unless they knew that money could be raised to pay overdue interest and taxes, that they did not want to make the trip to Kansas unless this could be done, saying, also, that "unless it is ready to close if it suits us, & you know we are not going to be hard to pleas if its worth any thing like they claim." On August 8 appellant wired Houchin, "We have seen farm G. W. Hamilton has accepted proposition and will take farm wire me at once at Wichita, Kans." Houchin answered same day, "Message received see letter sent August seventh if sure five hundred eighty-five dollars can be got to pay interest parties will be right out." On that day appellant wired back to Houchin, "Message received five hundred eighty five dollars will be paid." On the next day Houchin wired, "Myself and party will leave Bloomington 9:45 P. M. Thursday August Tenth wire me where to meet you better see Woodson county farm first have arrangements all made so we can get through quick as I will be in a hurry to get back." On August 10 appellant wired, "Prefer you to come direct to Wichita. Will be ready to go upon your arrival." On the same day Houchin wired to appellant that appellees had a cash offer of $20,000 and had wired an acceptance. and for that reason would not go but that if it.

did not go through they would go right out to Kansas. On the day appellant wired that Hamilton would take appellees' land, and which is called an acceptance· of appellees' proposal, he wrote a letter which shows how incomplete the negotations were. He informed Houchin that there was a $2200 mortgage on the Hamilton land although he had previously written that the mortgage was only $2000. He also suggested that appellees could assume that mortgage and that they might get along without the payment of more money than $2200. He further wrote that a deed should be executed by each party and placed in escrow in a certain bank until March 1 of the next year, then Hamilton was to pay $3925 into that bank, appellees to draw out $2200 of that amount and appellant to take the balance of that payment as commission. Showing that appellant understood that the deal was not closed he stated, "if you want to look at his Land, you must come at once," adding that the abstract of the land must be brought to date and sent to Hamilton for approval and that he would send abstract for his land as soon as contract was signed. He further added, "A Contract is to be gotten up and Signed by all Parties both Man and Wife, come strait down here or I will get it up and send it there for their Signatures, but things must be done quick." Some of these terms and conditions, which are obviously material, had never been considered and about them there had been no agreement. As was said in *Seymour v. Armstrong*, 62 Kan. 720, 64 Pac. 612:

"It is essential, however, that the minds of the contracting parties come to the point of agreement—that the offer and acceptance coincide; and if they do not correspond in every material respect there is no acceptance or completed contract." (p. 722.)

Aside from these conditions it is clear that appellees did not intend to bind themselves to an exchange until they had made a personal inspection of the land

offered to them, and it is equally clear that appellant understood that an agreement to exchange would not be complete until appellees had seen the Hamilton land and were satisfied to take it. The negotiations were preliminary and incomplete until satisfaction followed such personal inspection. As appellee said in her letter, when referring to the representations made as to the quality and condition of the Hamilton land, "we will close the deal soon as we find it to be so," and in another part of the letter, in speaking of making the trip of inspection, that they were "ready to close if it suits us." As was said in *Lyman v. Robinson*, 96 Mass. 242:

"A valid contract may doubtless be made by correspondence, but care should always be taken not to construe as an agreement letters which the parties intended only as a preliminary negotiation. The question in such cases always is, did they mean to contract by their correspondence, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted?" (p. 254.)

Here the parties were only arranging or settling terms of an agreement which they hoped to consummate, and the arrangement to raise $585 towards the payment of defaulted interest and taxes was only a step in the negotiations. So long as there was any element or condition of the proposed exchange of properties that was unsettled the control was incomplete and none of the parties was bound by the negotations. For the same reason no commission had been earned.

The judgment of the district court will be affirmed.